# UNITED STATES DISTRICT COURT

**FILED**

for the

ᐧ Eastern District of North Carolina

APR 2 7 2017

PETER A. MOORE, JR., CLERK
US DISTRICT COURT, EDNC
BY_____ DEP CLK

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

    Subject Electronic Devices
    Described in Attachment A

)
)
)
)
)

Case No. 7:17-mj-1127-BO

## APPLICATION FOR A SEARCH WARRANT

    I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the      **Eastern**      District of      **North Carolina**      , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

    The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

    ☑ evidence of a crime;

    ☑ contraband, fruits of crime, or other items illegally possessed;

    ☑ property designed for use, intended for use, or used in committing a crime;

    ☐ a person to be arrested or a person who is unlawfully restrained.

    The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 7 U.S.C. § 2156 | Animal Fighting Venture Prohibition |
| 18 U.S.C. § 371 | Conspiracy |

    The application is based on these facts:

See attached affidavit.

    ☑ Continued on the attached sheet.

    ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
    under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Task Force Officer James Keller, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: **4-27-17**

City and state:   Raleigh, North Carolina

_____
*Judge's signature*

Hon. Terrence W. Boyle, U.S. District Court Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF SUBJECT ELECTRONIC DEVICES DESCRIBED IN ATTACHMENT A** | Case No. _____ |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Task Force Officer James Keller, Federal Bureau of Investigation, being duly sworn,
depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a warrant to search for and seize fruits, evidence, and

instrumentalities of multiple criminal violations, more particularly described in Attachment B,

which is attached hereto and incorporated by reference, on the following electronic devices,

more particularly described herein and in Attachment A ("DEVICES"), attached hereto and

incorporated by reference:

      a.  The following items in the possession of LEWIS EDMOND ANDREWS, JR. at

            the time of his arrest on December 6, 2016, all of which are currently in the

            possession of the Federal Bureau of Investigation, located at 736 Medical Center

            Drive, Wilmington, NC, 28401:

            i.  a black AT&T flip cellular telephone identified by serial number

               322760336835;

1

  ii. a black Model A1349 iPhone cellular telephone identified by FCC

    identification number BCGE2422B; and

  iii. a San Disk digital memory card identified by serial number

    BN1613250430G.

  2.  The applied-for warrant would authorize the forensic examination of the

DEVICES for the purpose of identifying electronically stored data particularly described in

Attachment B.

  3.  Probable cause exists to believe that the requested information will constitute or

lead to evidence concerning offenses involving dog fighting, in violation of Title 7, United States

Code, Section 2156, and Title 18, United States Code, 371, as well as the identification of

individuals who are engaged in the commission of these offenses (hereinafter "Target

Offenses").

  4.  I have personally participated in the investigation set forth below. I am familiar

with the facts and circumstances of the investigation through my personal participation; from

discussions with other agents and investigators; from my discussions with witnesses involved in

the investigation; and from review of records and reports relating to the investigation. Unless

otherwise noted, wherever in this affidavit I assert that a statement was made, the information

was provided by another agent, law enforcement officer, or witness who may have had either

direct or hearsay knowledge of that statement and to whom I or others have spoken or whose

reports I have read and reviewed. Such statements are among many statements made by others

and are stated in substance and in part unless otherwise indicated. Since this affidavit is being

submitted for the limited purpose of securing a search warrant authorizing the search of the

aforementioned DEVICES, I have not included details of every aspect of the investigation. Facts

2

not set forth herein are not being relied upon in reaching my conclusion that the requested order should be issued. Nor do I request that this Court rely on any facts not set forth herein in reviewing this application.

5.     I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516.

6.     I am a Task Force Officer with the Federal Bureau of Investigation. I am currently assigned to the Wilmington, NC Field Office.

7.     I am a Detective with the Jacksonville Police Department in Jacksonville, North Carolina and have been employed with my agency for 8 years, 9 months. I am presently assigned to the Federal Bureau of Investigation, Safe Street Task Force in Wilmington, North Carolina and have been a Task Force Officer for almost 3 years. In that capacity, I routinely investigate violations of the federal criminal statutes. During my assignment, I have also spoken on numerous occasions with informants, suspects, and experienced investigators concerning the manner, means, methods, and practices that criminals use to further the operation of their criminal enterprises and the most effective methods of investigating and dismantling such organizations.

8.     I have received information from a Special Agent with the United States Department of Agriculture Office of Inspector General ("USDA-OIG") regarding illegal animal fighting. I have also spoken with a confidential, reliable informant who had been involved in illegal dog fighting for over twenty years. Through these sources of information, I have become familiar with the actions, traits, habits, and terminology utilized by handlers or owners of dogs involved in animal fighting ventures.

3

## BACKGROUND ON ANIMAL FIGHTING VENTURES

9.     The federal Animal Welfare Act defines "animal fighting venture" as "any event, in or affecting interstate or foreign commerce, that involves a fight conducted or to be conducted between at least 2 animals for purposes of sport, wagering, or entertainment." 7 U.S.C. § 2156(g)(1). It is illegal to sponsor or exhibit an animal in an animal fighting venture. 7 U.S.C. § 2156(a)(1). It is also illegal to possess, train, sell, buy, transport, deliver or receive an animal for purposes of having the animal participate in an animal fighting venture. 7 U.S.C. § 2156(b). All of these offenses are felonies punishable by up to five years in prison. 7 U.S.C. § 2156(j); 18 U.S.C. § 49.

10.     The Animal Welfare Act states that "[a] warrant to search for and seize any animal which there is probable cause to believe was involved in any violation of this section may be issued by any judge of the United States or of a State court of record or by a United States magistrate judge within the district wherein the animal sought is located." 7 U.S.C. § 2156(f). Any animal "involved in any violation of this section shall be liable to be proceeded against and forfeited to the United States" in either a civil or criminal proceeding. *Id.*; 28 U.S.C. § 2461.

11.     The remaining paragraphs in this section are based on the training and information I have received from reliable sources regarding illegal dog fighting. In the United States, dog fighting ventures involve "pit bull"-type dogs, which dog fighters prefer for their compact muscular build, short coat, and the aggression that some display toward other dogs. A dog fight occurs when two dogs are knowingly released by their handlers in a controlled environment to attack each other and fight. The fight ends when one dog withdraws, when a handler "picks up" their dog and forfeits the match, or when one or both dogs die.

4

12.     Because of their conditioning and training, dogs used in animal fighting ventures are housed separately from other dogs, in pens, cages, or on chains, so that they will not hurt or kill other dogs when the handler is absent. Heavy chains are often used when restraining dogs to develop neck strength in dogs used for fighting purposes.

13.     Dog fighters fight dogs with a goal of obtaining "Champion" or "Grand Champion" status for their dogs, which is achieved by winning three or five fights, respectively. They maintain contact with other dog fighters around the country, and can generate substantial income from gambling on dog fights and from the sale and breeding of fighting animals.

14.     Dog fighters select the strongest, most capable fighting dogs and selectively breed, sell, and fight only those dogs that display particular traits. Some of these traits are: (1) "gameness" or aggressiveness and propensity to fight other dogs; (2) a willingness to continue fighting another dog despite traumatic and/or mortal injury; and (3) cardiovascular endurance to continue fighting for long periods of time and through fatigue and injury. Dogs displaying these attributes are often bred with other dogs displaying similar traits to enhance the bloodline of these dogs for fighting purposes. Dog fighters such as the individuals described in this Affidavit keep such dogs solely for fighting purposes.

15.     It is a common practice for those involved in training and exhibiting fighting dogs to possess several dogs at one time. This practice is followed for several reasons. First, dog fighters maintain a stock of dogs at different weights and both sexes because in dog fights, dogs are matched against other dogs to within a pound of the same weight against dogs of the same sex. Maintaining a stock of several dogs thus increases the odds of owning a dog whose weight meets the requirements for a match being solicited by an opponent. Second, dog fighters also maintain

5

multiple dogs in order to selectively breed, sell, and fight dogs displaying certain traits or to otherwise advance a particular dog fighting bloodline.

16.     Further, dog fighters must possess an inventory of dogs because dogs often die or are badly injured during fights. Possessing multiple dogs also increases the prospects of owning a dog who will become a Champion or Grand Champion. Dog fighters also routinely test and evaluate their dogs to determine those that exhibit aggressive behavior, including against their own dogs.

17.     Dogs that lose fights or fail to show "gameness" are often killed. It is not uncommon for dogs that lose matches to be killed in cruel, torturous, and inhumane ways as punishment. The affiant is aware of cases in which dogs had been hung, electrocuted, drowned, and burned alive by dog handlers for losing matches or not meeting other criteria determined by their handlers. The remains of the losing dogs are often discarded in open pits or buried in a yard.

18.     Dog fights typically involve consistent practices leading up to and during the fight. Fighting dog owners or handlers enter into a verbal or written contract with their opponent several weeks before the dog fight, often referred to as a "match," "fight," or "show." The owners or handlers agree upon: (1) the sex and set weight of the dogs at the time of the fight; (2) the geographic area in which the fight will occur (the exact location of which is often a guarded secret until shortly before the fight); (3) a referee; (4) the payment of "forfeit" money that is lost if one participant pulls out of the match or if a participant's dog does not arrive at the agreed-upon weight; and (5) monetary wagers placed by the respective fighters.

19.     It can be challenging for dog fighters to find an opponent with a dog of the same weight and sex who is looking to fight that dog at the same time of year, and for a wager that is mutually agreeable to both parties. For that reason, dog fighters rely heavily on each other and on

6

extensive networks of contacts to find an opponent who has a dog of the same weight and sex and who is looking to fight that dog at the same time of the year. The practice is known as "calling out a weight." Dog fighters often "call out a weight" to known dog fighters in several states, to increase their odds of finding a match. "Calling out a weight" is done by telephone, text message, e-mail or other electronic communication. It is an integral practice without which many dog fights would not occur.

20.     Once a dog fighter locates an opponent and agrees upon terms, the match is "hooked," or set up. The dog then undergoes a conditioning process dog handlers refer to as a "keep." A "keep" is typically conducted for six to eight weeks before the scheduled match and involves a training program including: treadmills used to run and exercise the dogs away from public view; weight pulls used to increase the dog's strength and stamina; the use of devices such as "spring poles" and "flirt poles" to build jaw strength and increase aggression; and the administration of drugs, vitamins, and other medicine. Some of the drugs used, illegal and legal, include steroids to build muscle mass and aggression. Animal pelts are also common for dog fighters to use to excite and bait dogs during dog fighting training sessions. Dogs matched for future fights are expected to achieve their established target weight by the scheduled match, much like in human boxing matches, requiring close attention to a dog's routine. Training can take place at a dog fighter's "yard" or indoors away from public view.

21.     Dog fighters often attempt to mend the injuries of their own dogs, rather than seek veterinary attention, which might raise suspicion regarding the cause of their dogs' injuries. Dog fighters also use veterinary supplements and pharmaceuticals to enhance fighting dogs' stamina and to keep injured dogs fighting longer.

7

22.    Although dogs used for fighting are often housed outside, as the match date approaches, a dog in a keep may be housed indoors or near the owner/handler for several reasons. One reason is to prevent the dog from becoming sick or injured by other dogs before the match, which could cause the dog to forfeit and the owner to pay a forfeit fee. Another reason is that dogs in a keep require constant exercise and monitoring, which is easier when the dog is in close vicinity rather than off-site or outside. Dogs intended for fighting purposes are also often housed inside residences if they are injured, ill, pregnant, weaning, or if a dog fighter does not have another location to keep them or wants to keep them out of view.

23.    Some dog fighters are selective about who they will sell fighting dogs to, because the success of that dog in the fighting ring will reflect on the seller whose bloodline is represented by the dog. A dog that produces multiple offspring that go on to be "Champions" (*i.e.*, winning three or more dog fights) is bestowed the "Register of Merit" or "R.O.M." title. This provides incentive to the seller to sell dogs to capable dog fighters, with the intention that the dogs will be fought.

24.    It is common for those operating dog fighting ventures to maintain pedigrees, books, records, ledgers, and journals relating to the purchase, transportation, sale, breeding, and training of fighting dogs. These materials occur in both hard and electronic copy. Dog fighters often maintain information regarding dog fighting activities in order to stay current with the dog fighting community. "Underground" dog fighting publications similar to magazines are routinely published and distributed to readers through periodic subscriptions, which describe and report on recent fight details and past results from around the country using coded language. They also describe various "kennels" or dog breeders who raise dogs for animal fighting purposes. In addition, there are online versions of published magazines that serve the same purpose, as well as

8

websites where dog fighters post pedigrees to demonstrate the fighting lineage of their dogs. Dog fighters also maintain detailed ledgers and journals that specifically depict how certain dogs performed during a particular fight, together with the duration and outcome of fights.

25.     Dog fighters today tend to communicate via email, text messages, or website chat rooms dedicated to "game dogs." Dog fighters routinely hook matches and exchange documents, tips, photographs, or videos relating to dog fighting activities via electronic means. Dog fighters exchange videos, for example, to demonstrate the strength and gameness of their dogs.

## PRIOR SEARCH AND SEIZURE WARRANT

26.     Federal agents were investigating ANDREWS for violations of the federal Animal Welfare Act, 7 U.S.C. § 2156, pertaining to dog fighting, and for violations of the Controlled Substances Act, 21 U.S.C. §§ 846 and 841(a)(1), pertaining to sales of cocaine base, cocaine, and heroin. On November 21, 2016, this Court issued an arrest warrant for ANDREWS based on an Indictment filed that same day by a federal Grand Jury. See United States v. Andrews, et al., No. 16-CR-122-BO, DE-6. On December 5, 2016, United States Magistrate Judge Robert B. Jones, Jr. authorized a search and seizure warrant for 5901 Burgaw Highway, Maple Hill, North Carolina, 28454, where ANDREWS resided. See In the Matter of the Search of 5901 Burgaw Highway, Maple Hill, North Carolina, 28454, No. 7:16-mj-1238-RJ, DE-1.

27.     On December 6, 2016, federal agents executed the search warrant at the Burgaw Highway property and arrested ANDREWS. ANDREWS was present at the property during the search.

28.     The search warrant authorized the seizure and search of electronic storage devices for evidence of dog fighting.

9

29.     Agents seized several electronic devices (the DEVICES), specifically two cellular telephones and a digital memory card, from the Burgaw Highway property on December 6, 2016.

30.     The DEVICES are currently stored at the office of the Federal Bureau of Investigation in Wilmington, North Carolina. In my training and experience, I know that the DEVICES have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the DEVICES first came into the possession of the government.

31.     As described further below, I submit that there is probable cause to believe that evidence of dog fighting activity in violation of the federal Animal Welfare Act, 7 U.S.C. § 2156 will likely be found on electronic storage devices belonging to or used by ANDREWS.

32.     Therefore, the government requests permission to search all electronic storage devices that were seized pursuant to this Court's December 5, 2016 warrant from 5901 Burgaw Highway, Maple Hill, North Carolina, 28454 on December 6, 2016 (the DEVICES).

## **PROBABLE CAUSE TO SEARCH SEIZED DEVICES**

33.     Beginning in or about October 2015, and continuing through the present, members of the Federal Bureau of Investigation (FBI), the Jacksonville Police Department, and the Onslow County Sheriff's Office began a collaborative investigation into illegal dog fighting in the Onslow County area. In December 2015, investigators were able to identify a confidential, reliable informant (CI-1) who had knowledge of the dog fighting community and had been involved in dog fighting for over twenty years. CI-1 provided information to investigators regarding dog fighting that was independently verified and determined to be credible and reliable. In addition, investigators were able to identify another confidential, reliable informant (CI-2) who had knowledge of individuals in the Onslow County area who were engaged in sales of illegal

10

controlled substances. CI-2 had provided information to investigators regarding drug sales that was independently verified and determined to be credible and reliable. CI-2 had been utilized in the past to successfully arrest and prosecute individuals in state and federal courts.

34.     As a result of conversations with CI-1 and CI-2, agents were able to identify LEWIS EDMOND ANDREWS, JR. as an owner, sponsor, and exhibitor of pit bull-type dogs for participation in dog fighting. Both CI-1 and CI-2 told investigators that they knew ANDREWS to be involved in dog fighting and drug dealing out of his residence, located at 5901 Burgaw Highway, Maple Hill, North Carolina, 28454.

35.     CI-1 stated to investigators that he/she had known ANDREWS for over ten years and that CI-1 knew ANDREWS to be involved in dog fighting for years. CI-1 stated that ANDREWS was involved in promoting fights, and breeding, training, and fighting dogs. According to CI-1, ANDREWS has three sought-after blood lines in dogs that he owns and maintains at his residence. They are sought-after because they are past "Grand Champions" and came from Harry Hargrove. The affiant knows that Harry Hargrove was convicted in the Eastern District of North Carolina in 2011 for a violation of the Animal Welfare Act for his involvement in dog fighting in Duplin County, North Carolina.

36.     CI-2 stated that he/she had known ANDREWS for approximately 10 years. CI-2 had visited the PREMISES on several occasions and personally observed numerous pit bull-type dogs on the property.

37.     On or about December 17, 2015, CI-2 met with investigators to conduct a controlled meeting with ANDREWS at his residence located at 5901 Burgaw Highway, Maple Hill, NC 28454. The meeting was documented with audio and video recording devices. CI-2 travelled to the residence and met with ANDREWS and Cedric Gerard COOK, a co-defendant who has since

11

pled guilty to dog fighting offenses in the Superseding Indictment in this case. See United States v. Andrews, et al., No. 16-CR-122-BO, DE-201. During the meeting, ANDREWS and COOK discussed dog fighting and breeding and conditioning dogs for fighting. In addition, ANDREWS and COOK weighed a pit bull-type dog from a strap attached to the ceiling in preparation for a dog fight planned for the next few nights. The affiant has personally viewed the recording of the meeting and was able to positively identify ANDREWS and COOK.

38.     On or about December 19, 2015, CI-1 met with investigators to prepare to attend a dog fight with ANDREWS. CI-1 was searched prior to the event for illegal contraband and none was found. CI-1 was provided with case funds to pay for entry into the dog fight and place bets on which dog would win. CI-1 was also provided with audio and video recording devices to record the activity. CI-1 then left and travelled to ANDREWS residence, where at least eight individuals were meeting prior to the fight. While at ANDEREWS's residence, CI-1 observed between twenty and thirty dogs. ANDREWS advised that he was going to wash and weigh the dog he planned to participate in the dog fight that evening, and that they would be leaving to attend the event at a separate location.

39.     All parties left the residence and went to a property where the fight would take place. ANDREWS was exhibiting one of his dogs, named "Blondie," against another female dog brought from New York. When they arrived, ANDREWS and others worked together to assemble the fighting pit, and ANDREWS placed a $1,000 bet on the fight. The dogs fought for approximately 51 minutes, at which point Blondie was declared the winner. Both dogs were brought back to ANDREWS's residence, and CI-1 observed the owners of the losing dog collecting a gun and a shovel to shoot and bury the dog. CI-1 left the residence before the dog was

12

killed and retuned to investigators, where CI-1 handed over the audio and video recording device and debriefed with investigators.

40.     On or about January 2, 2016, CI-1 met with investigators to prepare to attend another dog fight with ANDREWS. CI-1 was searched prior to the event for illegal contraband and none was found. CI-1 was provided with case funds to pay for entry into the dog fight and place bets on which dog would win. CI-1 was also provided with audio and video recording devices to record the activity. CI-1 then left and travelled to ANDREWS's residence. When CI-1 arrived at the residence, he/she met with ANDREWS, who stated that he would not be attending the dog fight that night because he was meeting with someone to sell a dog for $5,000.

41.     On or about February 18, 2016, a North Carolina Highway Patrol officer conducted a traffic stop of a Kia minivan traveling back from Oklahoma in which ANDREWS was a passenger. In the back portion of the vehicle were several pit bull-type dogs in crates. As the vehicle was being searched, ANDREWS was placed in the rear of the patrol officer's car and he was captured on the in-unit recording device saying that he had "bought [the dogs] from world famous Bullyson Bobby Hall." The affiant is aware that Bobby Hall is a well-known breeder of Bullyson blood line pit bull-type dogs used in dog fighting who resides in Oklahoma.

42.     On December 6, 2016, law enforcement executed a search warrant signed by United States Magistrate Judge Robert B. Jones, Jr. to search the property of ANDREWS located at 5901 Burgaw Highway. ANDREWS was present at the location when agents entered the residence. No other individuals were present. During the search, agents located the following items on the property:

> a.  64 pit bull-type dogs, which were kept on the property in makeshift wooden boxes
>     or plastic barrels and affixed to heavy metal chains. The dogs were kept in separate

13

"runs" so that they could not touch each other, which is consistent with housing dogs involved in dog fighting;

b. A wooden and metal treadmill commonly used to condition dogs in preparation for dog fights;

c. Boxes of medical supplies such as hypodermic needles, staple guns, IV's, saline, and other medications commonly used to treat wounds for dogs that have been involved in dog fighting;

d. Large-size supplements such as protein powder and calcium commonly used to condition dogs for fighting;

e. Coconut oil and steroids commonly used to condition and prepare dogs for fights;

f. DVD's of videos of "Grand Champion" fights;

g. Several break sticks commonly used to pry apart dogs' jaws when fighting;

h. Numerous pedigrees that include comments regarding fights won and status;

i. Several books and other materials related to dog fighting, two of which were autographed by the authors to ANDREWS;

j. Homemade poster boards displaying photographs of pit bulls and a history of dog fighting and famous fighters;

k. $1,105 in US Currency;

l. a **black AT&T flip cellular telephone identified by serial number 322760336835** described in Attachment A;

m. a **black Model A1349 iPhone cellular telephone identified by FCC identification number BCGE2422B** described in Attachment A; and

14

n. a **San Disk digital memory card identified by serial number BN1613250430G**
described in Attachment A.

43.     Veterinary and behavioral analyses were conducted on the dogs seized from the
property by the American Society for the Prevention of Cruelty to Animals (ASPCA).    The
ASPCA concluded that the animals either had been, were, or were intended to be used in dog
fighting, with the exception of two non-Pit bull type dogs.    Out of 19 total adult dogs, 15 had
scarring or healing wounds consistent with organized dog fighting.    Out of 30 young adult dogs,
17 had scarring or healing wounds consistent with dog fighting.    Two of the dogs were found to
be in need of emergency veterinary care.    Some dogs were found to be emaciate to thin.    In
addition, behavioral analyses of the dogs showed that many possessed strong signs of aggression
towards other dogs, which is common when dogs have been trained to fight.

44.     The DEVICES are currently in the lawful possession of the Federal Bureau of
Investigation (FBI) and have been since their initial seizure on December 6, 2016.    Therefore,
while the FBI might already have all necessary authority to examine the Devices, I seek this
additional warrant out of an abundance of caution to be certain that an examination of the Devices
will comply with the Fourth Amendment and other applicable laws.

45.     The Devices are currently in storage in the FBI evidence locker located at 736
Medical Center Drive, Wilmington, NC, 28401.    In my training and experience, I know that the
Devices have been stored in a manner in which their contents are, to the extent material to this
investigation, in substantially the same state as they were when the Devices first came into the
possession of the FBI.

15

## TECHNICAL TERMS

46.    Based on my training and experience, I use the following technical terms to convey the following meanings:

      a.    Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

      b.    Digital Memory Cards:  A digital memory card is a storage media used to store recorded images, typically from a digital camera.  Images can usually be retrieved by connecting the digital memory card to a separate reader.

47.    Based on my training, experience, and research, I know that cellular telephone devices have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.  In my training and experience, examining data

16

stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

48.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

49.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.  Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

17

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

50. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

51. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

18

## CONCLUSION

52.    Based on the evidence listed above, the affiant respectfully submits that there is probable cause to find that violations of 7 U.S.C. § 2156 and 18 U.S.C. § 371 occurred, and that evidence of such violations is located on the DEVICES.

53.    Therefore, I respectfully request that the attached warrant be issued authorizing the search of the items listed above.

Respectfully submitted,

James Keller
Task Force Officer, FBI
Wilmington, NC Field Office

Subscribed and sworn to before me on **4 · 27 · 17**          , 2017

HON. TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE

19

## ATTACHMENT A

### Devices to be Searched

The following items all of which are currently located at 736 Medical Center Drive, Wilmington, NC, 28401:

1.      a black AT&T flip cellular telephone identified by serial number 322760336835;

2.      a black Model A1349 iPhone cellular telephone identified by FCC identification number BCGE2422B; and

3.      a San Disk digital memory card identified by serial number BN1613250430G.

This warrant authorizes the forensic examination of the Devices for the purpose of identifying the electronically stored information described in Attachment B.

# ATTACHMENT B

This warrant authorizes (i) the search of the Devices identified in Attachment A for only the following and (ii) authorizes the seizure of the items listed below only to the extent they constitute the following:

(a)   evidence of violations of Title 7, United States Code, Section 2156, and Title 18, United States Code, Section 371 ("Target Offenses"); or

(b)   any item constituting contraband due to the Target Offenses, fruits of the subject violations, or other items possessed whose possession is illegal due to the Target Offenses; or

(c)   any property designed for use, intended for use, or used in committing any Target Offenses.

Subject to the foregoing, the items authorized to be seized include the following:

1.   Contents of the telephone directory;
2.   Communications in the form of text, photographs, and/or images;
3.   Communications stored within applications installed on the Devices, including but not limited to Facebook, Snapchat, Instagram;
4.   Phone call logs;
5.   Stored communications to include voicemail, e-mails, or any other memory feature;
6.   Lists of customers and related identifying information;
7.   Photographs, videos, or other images stored;
8.   All bank records, checks, credit card bills, account information, and other financial records;
9.   Evidence of user attribution showing who used or owned the device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;
10.   Records of Internet Protocol addresses used; and
11.   Records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

1